**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

SARAH CAR CARE, INC.,                          :
                                               :
    Plaintiff,                             :
                                               :        Civil Action
    v.                                     :
                                               :        No. 21-1761
LOGISTICARE SOLUTIONS, LLC and                 :
MODIVCARE SOLUTIONS, LLC F/K/A                 :
LOGISTICARE AND/OR LOGISTICARE                 :
SOLUTIONS, LLC,                                :
                                               :
    Defendants.                            :

**<u>MEMORANDUM</u>**

**J. Younge**                                                    **January 9, 2024**

## I.      INTRODUCTION

Currently before this Court is Defendants LogistiCare Solutions, LLC and ModivCare Solutions, LLC f/k/a LogistiCare and/or LogistiCare Solutions, LLC (hereinafter "ModivCare")'s Motion to Dismiss or Stay and Compel Arbitration.  (ECF No. 5.)  The Court finds this Motion appropriate for resolution without oral argument.  Fed. R. Civ. P. 78; L.R. 7.1(f).  For the reasons set forth in this Memorandum, Defendants' Motion to Compel Arbitration is Granted, and this matter is referred to arbitration.

## II.     FACTUAL BACKGROUND

Defendant ModivCare was selected by Pennsylvania's Department of Human Services as a transportation broker that would coordinate non-emergency medical transportation for Medical Assistance consumers in Philadelphia County.  *See* Medical Assistance Transportation Program

(hereinafter "MATP") Agreement, ECF No. 1-1, pp. 60-71.[1]  The selection process, as outlined

in the Request for Proposals for the MATP, required that MATP proposals identify their

intended subcontractors, including specific instructions for intended partnerships with Small

Diverse Businesses (hereinafter "SDBs").  *See* Request for Proposals, ECF No. 1-1, pp. 73-91.

Any SDB participation submissions in an applicant's proposal had to include a written

commitment to assigning that SDB a certain numerical percentage of the total cost.  (Request for

Proposals, ECF No. 1-1, p. 78-79.)  The Request for Proposals specifies that a resultant MATP

agreement between the state and the winning applicant that includes SDB participation in its

MATP proposal "must also include a provision requiring the Selected Offeror to meet and

maintain those commitments made to SDBs at the time of proposal or negotiation."  (Request for

Proposals, ECF No. 1-1, p. 89.)  It further states that "The selected contractor's commitments to

[SDBs] made at the time of proposal submittal or contract negotiation shall, to the extent

provided in the commitment, be maintained throughout the term of the contract."  (Request for

Proposals, ECF No. 1-1, p. 91.)

    Plaintiff Sarah Car Care (hereinafter "SCC") is categorized as an SDB.  On November

15, 2016, in ModivCare's Letter of Intent to SCC (hereinafter "Services Commitment"),

included in its MATP proposal, ModivCare outlined its commitment to SCC as follows:

> If [ModivCare] is the successful vendor, Sarah Car Care, Incorporated shall provide
> Non-Emergency Medical Transportation in Philadelphia County on the start of the
> contract date to be determined as the effective date and will end three years after
> the effective date with a possible option to extend the agreement for one additional
> two year period.  These services represent 2.1% of the total cost in the [ModivCare]
> cost submittal for the initial term of the contract.  Dependent on final negotiated
> contract pricing and actual contract usage or volume, it is expected that Sarah Car
> Care, Incorporated will receive an estimated $5,000,000.00 (five million dollars
> and zero cents) during the initial contract term.

---

[1] When applicable, the Court adopts the pagination supplied by the CM/ECF docketing system,
which does not always match the document's internal pagination.

(Services Commitment, ECF No. 1-1, p. 93.)  ModivCare was awarded a $236 million grant from the Commonwealth of Pennsylvania and entered into the MATP Agreement with the Commonwealth on July 5, 2017, effective March 1, 2017.  *See* MATP Agreement, ECF No. 1-1, pp. 60-71.  The MATP Agreement was extended for two years until 2022.  (Notice from Pennsylvania Department of Human Services, ECF No. 1-1, p. 111.)

On November 30, 2017, ModivCare and SCC entered into their Transportation Agreement (hereinafter "TP Agreement"), which outlined expectations for the performance of services on assignments given to SCC by ModivCare.  *See* TP Agreement, ECF No. 5-2, pp. 5-51.  The TP Agreement states that ModivCare "wishes to enter into Agreements with qualified transportation companies for the provision of high-quality transportation services . . . under the terms and conditions set forth herein."  (TP Agreement, ECF No. 5-2, p. 5.)  There is no mention of the prior Services Commitment.  The arbitration clause at issue in this matter is contained in the TP Agreement, which states that "If any claim or controversy arising out of or relating to this Agreement cannot be resolved by the parties . . . the dispute shall be referred for binding arbitration in accordance with the commercial dispute arbitration rules of the American Arbitration Association."  (TP Agreement, ECF No. 5-2, pp. 24-25.)  The TP Agreement also includes an integration clause specifying that "This Agreement contains the entire agreement of the parties with respect to its subject matter and supersedes all prior oral or written agreements or understanding regarding the same subject matter."  (TP Agreement, ECF No. 5-2, p. 25.)

On March 18, 2021, SCC filed a Complaint against ModivCare, alleging that it had been under-assigned projects in violation of the Services Commitment, resulting in ModivCare being $3 million short of their commitment by the expiration of the MATP Agreement.  *See* Complaint, ECF No. 1-1, pp. 7-58.  SCC has brought claims for breach of the Services

3

Commitment, breach of contract as a third-party beneficiary to the MATP Agreement,

promissory estoppel, unjust enrichment, and racial discrimination in violation of 42 U.S.C. §

1981 and Title VI of the Civil Rights Act of 1964.  *See* Complaint, ECF No. 1-1, pp. 7-58.  The

Complaint makes no mention of the TP Agreement.  This case was removed to this Court on

April 15, 2021.  *See* Notice of Removal, ECF No. 1.  On April 22, 2021, ModivCare filed its

Motion to Compel Arbitration based on the arbitration clause contained in the TP Agreement.

(ECF No. 5.)  The Court ordered supplemental briefing on October 17, 2023.  (Order, ECF No.

33.)

## III.   LEGAL STANDARD

The Federal Arbitration Act ("FAA") reflects the strong federal policy in favor of

arbitration and "places arbitration agreements on equal footing with all other contracts."

*Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).  Pursuant to the FAA,

courts "compel arbitration of claims covered by a written, enforceable arbitration agreement."

*Bacon v. Avis Budget Grp., Inc.*, 959 F.3d 590, 599 (3d Cir. 2020) (citing FAA, 9 U.S.C. §§ 3,

4).  However, "[a]rbitration is strictly a matter of contract" and is thus governed by state law.

*Bel-Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 441, 444 (3d Cir. 1999).  The federal policy

encouraging recourse to arbitration requires federal courts to look first to the relevant state law of

contracts, here Pennsylvania, in deciding whether an arbitration agreement is valid under the

FAA.  *Spinetti v. Serv. Corp. Int'l*, 324 F.3d 212, 213 (3d Cir. 2003).  Accordingly, when

deciding whether to compel arbitration under the FAA, the Court must determine "(1) whether

there is a valid agreement to arbitrate between the parties and, if so, (2) whether the merits-based

dispute in question falls within the scope of that valid agreement."  *Sanford v. Bracewell &*

*Guiliani, LLP,* 618 F. App'x 114, 117 (3d Cir. 2015); *see also Trippe Mfg. v. Niles Audio Corp.*,

401 F.3d 529, 532 (3d Cir. 2005) ("When determining both the existence and the scope of an

arbitration agreement, there is a presumption in favor of arbitrability.").

IV.    **DISCUSSION**

   A.    **A Valid Arbitration Agreement Exists Between the Parties.**

   In deciding whether a valid arbitration agreement exists between the parties, the Court

must first decide whether to apply the Federal Rule of Civil Procedure 12(b)(6) or Rule 56

standard of review.  *Sanford*, 618 F. App'x at 117.  The Court will review a motion to compel

arbitration under the Rule 12(b)(6) standard "when it is apparent, based on the face of a

complaint, and documents relied upon in the complaint, that certain of a party's claims are

subject to an enforceable arbitration clause."  *Guidotti v. Legal Helpers Debt Resolution, LLC*,

716 F.3d 764, 776 (3d Cir. 2013) (internal quotations omitted).  Under this standard, the Court

accepts as true all factual allegations in the complaint to determine whether those facts would

relieve the plaintiff of the arbitration requirement.  *Id.*; *see also CardioNet, Inc. v. Cigna Health

Corp.*, 751 F.3d 165, 168 n.2 (3d Cir. 2014) (under the 12(b)(6) standard to a motion to compel

arbitration, the court may "consider the substance of the contracts that ostensibly compel

arbitration").  Conversely, the Rule 56 standard will apply "when either the motion to compel

arbitration does not have as its predicate a complaint with the requisite clarity to establish on its

face that the parties agreed to arbitrate, or the opposing party has come forth with reliable

evidence that is more than a naked assertion . . . that it did not intend to be bound by the

arbitration agreement, even though on the face of the pleadings it appears that it did."  *Guidotti*,

716 F.3d at 774 (internal quotations omitted).  Here, the Court will apply the Rule 12(b)(6)

standard in considering the arbitration clause because the arbitration clause is apparent on the

face of the Complaint.

1.     The TP Agreement is Integral to Plaintiff's Claims.

An arbitration clause is apparent on the face of a complaint where it is integral to the complaint. *See Saechow v. Phila. Acad. Health Sys., LLC*, Civ. No. 19-2075, 2021 WL 1210008, at *9 (E.D. Pa. Mar. 31, 2021) ("[A]n arbitration agreement need not be attached to the complaint in order to be 'apparent.'"); *see also Lawson v. City of Phila.*, Civ. No. 18-1912, 2019 WL 934976, at *2 (E.D. Pa. Feb. 25, 2019) ("An arbitration clause may be deemed 'apparent' even when a contract, though not appended to the Complaint, is integral to, and referenced in, the Complaint") (internal quotations omitted).  A document is considered integral to the complaint if it was relied on in framing the complaint, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997), or if it "by its very existence, *and not the mere information it contains*, gives rise to the legal rights asserted" in the complaint, *Santana v. A.L. Recovery, LLC*, Civ. No. 18-16, 2018 WL 3912830, at *4 (W.D. Pa. Aug. 16, 2018) (emphasis in original) (internal citations omitted).  Pennsylvania law tends to read together instruments created as part of a single transaction and will construe them "with reference to the other," even if they "may have been executed at different times and do not in terms refer to each other." *Huegel v. Mifflin Constr. Co.*, 796 A.2d 350, 354-55 (Pa. Super. Ct. 2002).  Here, SCC's Complaint cannot be considered separately from the TP Agreement as the logistics of performing the Services Commitment are integral to a claim of breach.

The Complaint relies on agreements that recognize the inevitability, and indeed the necessity, of the TP Agreement, which contains the provisions for how the assignments, as referenced in the Services Commitment, would actually be performed.  The Request for Proposals specifically required that ModivCare enter into contracts with its subcontractors that outline certain operating terms if selected.  (Request for Proposals, ECF No. 1-1, p. 88.)  The

Services Commitment itself contemplates a future contract putting its commitment into effect, noting that the anticipated dollar amount that would go to SCC is "[d]ependent on final negotiated contract pricing and actual contract usage or volume" (Services Commitment, ECF No. 1-1, p. 93.)  Although the Complaint does not reference the TP Agreement explicitly, the two contracts that were allegedly breached – the Services Commitment and the MATP Agreement – clearly contemplate its existence.

Moreover, the logistics of implementing an original agreement cannot be separated from that original agreement where, as here, the Services Commitment could not be performed without reference to the provisions of the TP Agreement.  *See Campano v. Kitchens, Inc.*, Civ. No. 21-1317, 2021 WL 2473900, at *2 (E.D. Pa. June 17, 2021) (finding that arbitrability was apparent on the face of the complaint because it relied on an employment relationship governed by the Employment Agreement, which contained an arbitration clause, making the Agreement integral to the complaint).  An agreement to provide services and an agreement detailing how those services will be provided must be considered part of the same transaction.  Whether there was compliance or noncompliance with the terms of the TP Agreement is integral to determining whether there was a breach of the Services Commitment, particularly because the Parties dispute whether SCC complied with such terms.  *See* Motion to Compel Arbitration, ECF No. 5-1, p. 15.

To find otherwise, and to consider the Services Commitment in isolation from the TP Agreement, would require the Court to find that ModivCare's commitment to give SCC a certain number of assignments can be considered separately from the terms upon which ModivCare will give SCC those assignments.  The Court finds these issues to be inseparable.  The fact that these terms were finalized the following year, after the grant was awarded to ModivCare, does not make them any less integral to the understanding of their contractual relationship or

ModivCare's compliance, or lack thereof, with the Services Commitment.  Instead, the Parties' relative obligations to each other, as outlined through both the Services Commitment and the TP Agreement, must be read together.  In reading these documents together as part of the same transaction, the Court finds that the TP Agreement's arbitration clause is apparent on the face of the Complaint.

2. The Arbitration Clause is Enforceable.

Under the FAA, courts must enforce a valid arbitration clause based on ordinary contract principles of the relevant state law.  *See China Minmetals Materials Imp. & Expo. Co., Ltd. v. Chi Mei Corp.*, 334 F.3d 274, 290 (3d Cir. 2003).  Under Pennsylvania law, the court must determine:  "(1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration."  *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002).  The Court finds that the Parties manifested an intent to be bound by the arbitration clause and that that arbitration clause was supported by consideration.  As the definitiveness of the TP Agreement's terms is not in dispute, the Court will not consider it.

i. *Plaintiff's Evidence is Insufficient to Support a Finding that There Was a Lack of Intention to be Bound by the Arbitration Clause.*

SCC has failed to provide evidence showing that, despite signing the TP Agreement, it did not intend to be bound by its terms, including the arbitration clause.  Pursuant to the first prong, in Pennsylvania, "[c]ontracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains."  *Simeone v. Simeone*, 525 Pa. 392, 400 (Pa. 1990).  Having mutual assent between the contracting parties is an essential part of contract formation.  *Morales v. Sun Constructors, Inc.*, 541 F.3d 218, 221 (3d Cir. 2008).  After signing a

contract, a party may not claim they were unaware of or did not understand the material in the contract. *Bollinger v. Central Pa. Quarry Stripping & Constr. Co.*, 425 Pa. 430 (Pa. 1967).

Here, SCC appears to suggest that, because SCC's owner, Mr. Abuelgasim Mohamed, is a nonnative English speaker and lacks a legal education, SCC lacked the intention to be bound by the arbitration clause when Mr. Mohamed signed the TP Agreement. (Plaintiff's Response in Opposition to Defendant's Motion to Compel Arbitration, ECF No. 11, pp. 17-18.) Additionally, SCC suggests that Mr. Mohamed may not have read the TP Agreement prior to signing, though it has not offered any evidence in support of that suggestion. (Plaintiff's Response, ECF No. 11, p. 18.) That the Plaintiff's agent speaks English as a second language or lacks a legal education is insufficient to show that SCC lacked the intent to be bound by the provisions of the TP Agreement, including the arbitration clause. *See Morales*, 541 F.3d at 222-23 (finding that, in the absence of fraud, the fact that a party did not understand the language the contract was written in before executing it does not affect the enforceability of the contract because it is the parties' obligation to acquaint themselves with the content before binding themselves to it.) Lacking supportive evidence, the presentation of a hypothetical situation in which Mr. Mohamed had not been able to read the TP Agreement prior to signing is similarly unpersuasive.

Furthermore, the realities of a subcontractor agreement that forms a necessary part of meeting a grantee's obligations to the Commonwealth weighs in favor of finding that the Parties intended to be bound by this arbitration clause. The determination that arbitration would serve as a more efficient and practical tool to resolve disputes than litigation, thereby limiting interference with obligations under the MATP Agreement, is a practical consideration that supports finding that the Parties knowingly chose to arbitrate claims between them. The Court therefore finds that the Plaintiff has not shown that they did not intend to be bound by the arbitration clause.

ii.     *The Arbitration Clause Was Supported by Consideration.*

Both the arbitration clause and the TP Agreement it was attached to are supported by consideration.  Consideration will be found where the contracting parties receive something of value in exchange for their respective promises or detriments.  *Universal Computer Sys. v. Med. Servs. Ass'n of Pa.*, 474 F. Supp. 472, 477 (M.D. Pa. 1979), *aff'd*, 628 F.2d 820 (3d Cir. 1980). Mutual promises constitute consideration.  *In re Ratony's Estate*, 277 A.2d 791, 793-94 (Pa. Super. 1971).   Pennsylvania courts will not inquire into the adequacy of the consideration made. *Romero v. Allstate Ins. Co.*, 1 F. Supp. 3d 319, 404 (E.D. Pa. 2014).

The Third Circuit has made clear that a mutual promise to arbitrate constitutes sufficient consideration to support an arbitration agreement apart from its attached contract.  *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603-04 (3d Cir. 2002).  Furthermore, the TP Agreement itself is supported by sufficient consideration.  While SCC argues that its claims rest solely on the Services Commitment made the year prior, this Court agrees with ModivCare that the TP Agreement outlines SCC's promise to provide those services in a certain way in exchange for ModivCare's returned obligations.  The TP Agreement is not merely a reiteration of an earlier obligation by ModivCare – it is an agreement whereby ModivCare provided that it would pay a certain amount for certain services performed in a particular way.  These are mutual promises that constitute consideration for the agreement itself as well as the embedded arbitration clause. As such, the Court finds that the arbitration clause is valid and binding on the parties.

B.     **Arbitrability Will be Determined by the Arbitrator.**

Courts will generally decide issues of arbitrability unless, as here, this power has been expressly delegated to the arbitrator.  Arbitrability considers whether the dispute falls within the scope of the arbitration clause. *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132, 137 (3d

Cir. 1998).  The issue of scope is substantive and subject to federal law as set out in the FAA.

*Mitsubishi Motors Corp. v. Soler Chrysler*, 473 U.S. 614, 626 (1985).  Federal policy favors

arbitration, and "doubts concerning the scope of arbitrable issues should be resolved in favor of

arbitration."  *Id.* (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-

25 (1983).  In determining whether a claim "falls within the scope of an arbitration agreement,

the focus is on the factual underpinnings of the claim rather than the legal theory alleged in the

complaint."  *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 55 (3d

Cir. 2001) (internal citations omitted).  A claim may fall within the scope of an arbitration clause

in a related contract even if arising under an agreement without an arbitration clause.  *See*

*Brayman Constr. Corp. v. Home Ins. Co.*, 319 F.3d 622, 626 (3d Cir. 2003) (finding that, where

a claim arises under a contract containing no arbitration clause, it still may be arbitrated when its

underlying allegations "touch matters" covered by an arbitration clause); *In re NBR Antitrust*

*Litigation*, 207 F. App'x 166, 172 (3d Cir. 2006) (finding that an indemnification claim arising

under an agreement that *did not* contain an arbitration clause but was premised on the alleged

breach of covenants under related contracts *with* an arbitration clause was arbitrable because of

the "impossibility of reaching the merits of [the party's] claim without resolving arbitrable

questions").

      Courts "should not assume that the parties agreed to arbitrate arbitrability unless there is

clear and unmistakable evidence that they did so."  *First Options of Chicago, Inc. v. Kaplan*, 514

U.S. 938, 944-47 (1995).  If such "clear and unmistakable evidence" is found, a court may not

decide the arbitrability issue.  *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524,

530 (2019).  To be "clear and unmistakable," the relevant provisions "must be both specific and

exclusive."  *PPT Research, Inc. v. Solvay USA, Inc.*, Civ. No. 20-2645, 2021 WL 2853269, at *3

(E.D. Pa. July 7, 2021) (internal citations omitted).  Here, the express terms of the arbitration clause delegate decisions as to the arbitrability of SCC's claims – breach of the Services Commitment, breach of the MATP Agreement to which SCC is a third-party beneficiary, promissory estoppel, unjust enrichment, and violations of Section 1981 and Title VI – to the arbitrator.

The relevant arbitration clause states that "[i]f any claim or controversy arising out of or relating to this Agreement cannot be resolved by the parties . . . the dispute shall be referred for binding arbitration in accordance with the commercial dispute arbitration rules of the American Arbitration Association."  (TP Agreement, ECF No. 5-2, pp. 24-25.)  The mandatory and expansive language contained within this clause specifically incorporates the AAA rules, which the Third Circuit has found supports that there was a "clear and unmistakable" intent to delegate decisions as to arbitrability to the arbitrator.  *Richardson v. Coverall North America, Inc.*, 811 F. App'x 100, 103 (3d Cir. 2020); American Arbitration Association, Commercial Arbitration Rules and Mediation Procedures, Rule 7(a) ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to . . . the arbitrability of any claim or counterclaim").  While "a contract might still otherwise muddy the clarity of the parties' intent to delegate" despite reference to the AAA rules, *Richardson*, 811 F. App'x at 103 n.2, the contract at issue here is unambiguous in its delegation of authority.  The Third Circuit in Richardson found that a similar provision – stating that "all controversies . . . shall be submitted promptly for arbitration . . . subject to . . . the then current rules of the American Arbitration Association for Commercial Arbitration" – was "about as 'clear and unmistakable' as language can get."  *Id.* at 103 (internal citations omitted).  This Court finds the same here.  As such, the Court will grant

12

the Defendants' Motion to Compel Arbitration with arbitrability to be determined by the arbitrator.

**V.      CONCLUSION**

For the foregoing reasons, Defendants' Motion to Compel Arbitration is Granted, and this matter is referred to arbitration.

An appropriate Order follows.

**IT IS SO ORDERED.**

BY THE COURT:

/s/ John Milton Younge
**Judge John Milton Younge**